# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In Re The Application of:<br><br>ALMA ROSA ORNELAS GAVIA,<br><br>               Petitioner,<br><br>vs.<br><br>MARTIN RICARDO TORRES<br>HERNANDEZ A/K/A JAIME EDUARDO<br>COVARRUBIAS,<br><br>            Respondent. | **FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW**<br><br><br>Case No. 2:13-cv-00987<br><br>Honorable Clark Waddoups |

This matter is before the court on Alma Rosa Ornelas Gavia's ("Petitioner" or "Ms. Ornelas") Verified Complaint and Petition for Return of Minor Children pursuant to the Hague Convention on the Civil Aspects of International Child Abduction[1] (the "Hague Convention" or the "Convention") and the International Child Abduction Remedies Act[2] ("ICARA"). The court initially set a hearing on the Petition for November 5, 2013. At that hearing, however, Respondent Martin Ricardo Torres Hernandez a/k/a Jaime Eduardo Covarrubias ("Respondent" or "Mr. Torres"), who is the father of the children, requested that the court continue the hearing to allow him to obtain counsel and to respond to the Petition. The court then rescheduled the hearing for November 12, 2013. At the hearing, Petitioner was represented by Wesley D. Felix

---

[1] Oct. 25, 1980, T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted* in 51 Fed. Reg. 10494 (1986).

[2] 42 U.S.C. §§ 11601-11610 (2011).

and Paul W. Shakespear.  Respondent was represented by Benson L. Hathaway.  The court appointed a Guardian Ad Litem, Keith A. Call, who also participated in the hearing.

Prior to the November 12, 2013 hearing, the court carefully reviewed the Petition, the Response to the Petition (the "Response Brief"), and all affidavits and exhibits that had been provided to the Court.  At the November 12, 2013 hearing the court heard testimony and received evidence, but requested that the parties submit proposed findings of fact and conclusions of law and then present closing argument.  The Respondent and the Guardian ad litem, jointly, and Petitioner submitted proposed findings on November 18, 2012.  The court heard closing argument on November 19, 2013.

## I.  BACKGROUND

1.  **GENERAL FACTUAL BACKGROUND**

Petitioner claims that her husband wrongfully removed the parties' two minor children, ABTO and MZTO, from their habitual residence in Mexico in July of 2012.  Petitioner and Respondent separated in 2009, but have not pursued legal divorce proceedings.  Petitioner contends that ABTO and MZTO were transported to Sandy, Utah with the understanding that they would be returned to Mexico after completing a two-week visit with the Respondent.  She further claims that shortly thereafter, Respondent informed her that the children would never be returned to Mexico.  In response to Respondent's attempt to retain custody of the children without permission, Petitioner filed an application for return under the Hague Convention with the designated Mexican Central Authority on August 1, 2012.  Respondent claims that the children came to Utah with the consent of their mother and it was understood that they would remain in the United States unless and until they expressed the desire to return to Mexico.

2.    LEGAL BACKGROUND

This action has been brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention"), which has been implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610.  The Hague Convention was adopted to protect children from the adverse effects of being wrongfully removed to or retained in a foreign country and to establish procedures for their return.  *See Ohlander v. Larson*, 114 F.3d 1531, 1534 (10th Cir. 1997) (citing the Hague Convention on the Civil Aspects of International Child Abduction, Dec. 23, 1981, Preamble, 51 Fed. Reg. 10494, 10,498 (1986)).  "The Convention is meant to provide for a child's prompt return once it has been established the child has been 'wrongfully removed' to or retained in any affiliated state." *Id.*  (quoting Convention, art. 1).  When a Petition is filed under the Hague Convention, the court's role is not to make traditional custody decisions, but to determine in what jurisdiction the children should be physically located so that the proper jurisdiction can make those custody decisions.  *Loos v. Manuel*, 651 A.2d 1077 (N.J. Super. Ct. Ch. Div. 1994); *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996).

## II.  HISTORY OF CASE

Petitioner filed the instant action on October 29, 2013.  At the same time, she filed an *Ex Parte* Motion Under the Hague Convention for a Temporary Restraining Order, Application for Warrant Seeking Physical Custody of Children and Scheduling of an Expedited Hearing and Memorandum in Support (the "Motion for a TRO").  On November 1, 2013, the court granted the Motion for a TRO and entered an Order (the "November 1, 2013 Order") which, among other things, prohibited Respondent from removing the children from the jurisdiction of the court pending a determination on the merits of the Verified Complaint.  The November 1, 2013 Order

also stated that the court would hold an immediate hearing after the Order was served on Respondent to determine whether the court should order the return of the children to Mexico.

Pursuant to the court's order, the United States Marshal Service brought the children to court on November 5, 2012. Their father, the Respondent, accompanied the children and appeared in court. He was first served with the Petition a few minutes before the court hearing. The Respondent requested counsel. The court appointed pro bono counsel to represent the Respondent and also separate pro bono counsel to act as guardian ad litem for the children. The court set the matter for an evidentiary hearing on November 12, 2013.

At the November 12, 2013 hearing, the court heard testimony from both of the children together, from Ms. Ornelas and Mr. Torres and received into evidence exhibits stipulated to by counsel for all parties. At the November 12, 2013 hearing, the court conducted the interview of the minor children in chambers. Counsel for the parties were present, but to avoid undue pressure on the children, the Petitioner and Respondent were not at the interview. Although the children were not formally placed under oath, the court explained the importance of their statements and asked each to promise to tell the truth, which each did. The Guardian Ad Litem, the court and counsel for Petition asked questions. Each counsel was given the opportunity to ask follow-up questions.

## FINDINGS OF FACT

1.      Petitioner is a Mexican national residing currently in the City of Leon, Mexico in the State of Guanajuato.

2.      Respondent is a Mexican national residing in Sandy, Utah in the United States.

3.      Petitioner and Respondent were married in Leon, Mexico on March 19, 1999. After their marriage in 1999, Petitioner and Respondent moved to the United States.

4.      ABTO was born in Los Angeles, California on February 28, 2001.  MZTO was born in Los Angeles, California on February 15, 2002.  ABTO and MZTO (collectively the "Children") are both United States' citizens.  They lived in California until 2009, with the exception of a period prior to 2009 when the Petitioner took the Children to Mexico.  The record does not reflect when or how long they remained in Mexico on that occasion.

5.      On or about July 7, 2009, Petitioner and Respondent separated.  After the separation, Petitioner returned with the children to her parent's home in Leon, Mexico.  Respondent relocated from California to Utah.  Petitioner and Respondent remain married, and there has been no judicial or other proceeding regarding the custody of the minor children.

6.      Respondent testified that as Petitioner was preparing to leave him and take the Children to Mexico, she told him that if he would not agree to them residing with her in Mexico that she would take them and disappear in Mexico.  Respondent therefore acquiesced to the Children residing with Petitioner in Mexico.

7.      Shortly after Petitioner moved to Mexico, she gave birth to a third child SCTO, who is the daughter of Petitioner and Respondent and the sister of ABTO and MZTO.

8.      Between July 2009 and late June 2012, Petitioner and the children lived with Petitioner in her family home in Leon, Mexico. During their residence in Mexico, ABTO and MZTO attended private Catholic school.

9.      While their maternal grandmother was alive, ABTO and MZTO attended Catholic Church, but after their grandmother died, they no longer attended.  While the Children were in Mexico, Respondent called them regularly, sometimes every day.  Respondent testified that during those conversations the Children frequently asked to come live with Respondent in the United States.

10.     The children's mother, the Petitioner, works in Mexico as a secretary 20 hours per week.

11.     Petitioner has a boyfriend.  In approximately January 2012, he came to live with Petitioner and the Petitioner's three children in Petitioner's parents' house.  In approximately March 2012, the boyfriend's three children also came to live in the house.  Petitioner's boyfriend and his three children continue to reside with Petitioner.

12.     The house consists of four stories, the upper two of which are largely uninhabited.  The Children shared a bedroom until early 2012 when Petitioner's boyfriend's three children moved in.

13.     The Children testified that this addition made the house crowded and required that the Children be separated and moved into other rooms.  MZTO and another child moved into a bedroom which had been the grandmother's, and ABTO slept in a balcony room.

14.     The Children said that they do not have a good relationship with Petitioner's boyfriend and two of his children.

15.     While the Children were living in Mexico, the Petitioner did not regularly cook for them, often leaving one of the Children to prepare the family meals.  One of the Children was often sent alone to buy food, which made her nervous.

16.     The Petitioner "partied" and sometimes left the Children to care for themselves and their younger sister for long periods while Petitioner was away.

17.     On occasion, Petitioner threw things at the Children, once throwing her cell phone at one of the Children.

18.     On one occasion, Petitioner struck one of the Children in the back of the head, which caused the child to strike her front tooth, breaking it.

19. Although the Petitioner testified that the area where they lived is safe, the Children said that they feared going out onto the streets because of a fear of gang activity.

20. Petitioner did not take the Children to the doctor in Mexico, but relied on their grandfather to make medications to care for them when ill.

21. When their grandmother died, Petitioner did not allow the Children to attend their grandmother's funeral.

22. The Children do not feel safe living with Petitioner in Mexico.

23. While the Children were living in Mexico, the Respondent regularly sent money to the Petitioner for the support of the Children, including tuition for private schooling. The money was sent by wire transfer and included a receipt that in every instance reflected the address in Utah where Respondent resided and continues to reside after the Children came to Utah.

24. The Petitioner acknowledges receiving money, but denies receiving a receipt or knowing Respondent's Utah address. The court questions the Petitioner's credibility on this issue. The receipts signed by Respondent, showing his address, were received in evidence and support an inference that Petitioner received the same documentation when she accepted the money in Mexico.

25. In April or May of 2012, Petitioner and Respondent began to discuss the possibility of the Children coming to live with the Respondent in Utah.

26. The Petitioner testified that in June of 2012, she agreed to allow ABTO and MZTO to travel to Utah to be with their father. Petitioner testified that the children were to remain in Utah for only two weeks at which time they were to return to Mexico.

27.     The Children testified that their mother told them they were coming to Utah to visit for two-weeks.

28.     The Respondent testified that the children wanted to come to Utah and remain indefinitely.  He testified that they were to remain in Utah until they decided they wanted to return to Mexico.  He denies that there was any agreement that the children would return to Mexico after two-weeks.

29.      To arrange for the children's travel to Utah, Respondent purchased one-way airfare for the Children from Leon to Tijuana, Mexico, and arranged for transportation from Tijuana to Respondent's home in Utah.  The Petitioner does not deny that Respondent purchased only one-way airfare.

30.     The Children arrived in Utah on July 3, 2012.

31.     Upon arrival in Utah, the Children carried with them a passport, social security cards, child identification cards issued by the state of California, immunization records for both Children, and birth certificates which had been given to them by the Petitioner before they left Mexico.

32.     Petitioner testified that once the two-weeks had passed, Respondent refused to return the Children to Mexico and told her she would never see her Children again.

33.     Petitioner testified that she contacted the FBI and the Mexican Consulate in Salt Lake City, Utah in an effort to have her Children returned.

34.     Then on August 2, 2012, Petitioner filed with the Secretary of Foreign Ministry in Guanajuanto, Mexico, a request for the return of the Children, claiming they had been wrongfully retained in Utah.  (Plf. Exs. 6 and 7).

35.     Eventually, through the aid of different agencies, Petitioner retained pro bono counsel to assist her in seeking the return of the Children.

36.     Petitioner testified that she did not know the address where the Children were residing and was unable to find their location until shortly before the Verified Complaint was filed in this case on October 29, 2013.  The Complaint lists an erroneous address for the Children.

37.      Since July of 2012, the Children have remained in the United States, residing at all times at the same address in Utah with Respondent.  Respondent testified that he has made no effort to conceal the Children or hide their whereabouts.

38.     ABTO is now 12 years old and has lived in the United States for 9 of her 12 years, except for the short period she lived in Mexico with her mother prior to 2009.

39.     MZTO is now 11 years old and has lived in the United States for 8 of her 11 years, also with the exception of the short period in Mexico prior to 2009.

40.     The Children are both fluent in English and are well acclimated to living in the United States.

41.     At the end of the summer of 2012, the Children were enrolled in public schools in Sandy, Utah, where they participated for a full school year.  They have now begun their second year since returning to the United States.

42.      Both Children are doing well in school.  Their attendance records reflect that they attend school regularly and rarely miss.  They are getting mostly A's and B's in their classes, and appear to be improving since enrolling in school in Utah at the start of the 2012-13 school year.

43.     The Children's teachers have given both girls high marks for citizenship and scholarship.

18256316.2                                        9

44.     MZTO's teacher in the 6th grade Social Studies Class wrote that "she has been doing extremely well . . . .  She works hard in class and always arrives to school on time, awake and ready to learn.  She had had only a small number of absences due to an illness, but she worked with her father to get caught up on the work she missed.  She has proven herself to be a dedicated, hard-working student who has a lot of support at home."  (GAL Ex. 1).

45.     The Instrumental Music Director and Creative Writing and Debate teacher wrote, "Both [MZTO and ABTO] are a true joy to have in class.  I teach [MZTO] in beginning orchestra class, where she is learing to play the violin.  [ABTO] is in my intro to debate class, here her critical thinking skills are being enhanced and practiced.  Each one is a wonderful student, with good grades and participation in class.  Mr. Torres is highly involved in his daughters lives, attending parent teacher conference to ensure their full participation in school.  Each of the Torres girls has many friends, and find it easy to work well with others while in class."  (GAL Ex. 2.)

46.     MZTO testified that she very much enjoys playing the violin and wants to continue with violin lessons.  One of her goals is to become a violinist.  ABTO  enjoys participating in debate.  Both have been enrolled and will soon begin general music lessons.

47.     The Children each have friends at school and in their current neighborhood and are well integrated in their current family, school, neighborhood and community.

48.     Respondent's sister lives next to Respondent and the Children like spending time with her and their cousin.  They also associate with other members of Respondent's extended family who live in the State of Utah.

49.     The Petitioner testified that she has been limited in her ability to talk with the Children since they came to Utah.  The Children testified, however, that they have talked

frequently with their mother and communicated through Facebook.  Sometime in Fall 2013, MZTO became upset when she learned her mother was pregnant with her boyfriend's child. Respondent testified that he has permitted the Children to talk with their mother, but since the controversy arose over the mother's pregnancy, the Children, particularly MZTO, have not wanted to talk on the telephone.  Petitioner did limit Facebook contact after the controversy arose.

50.     Nevertheless, the evidence supports a finding that prior to the Fall 2013, the Children had frequent telephone and Facebook contact with their mother.

51.     Respondent works as a landscaper and has been employed by his present employer since moving to Utah in 2009.  In the winter, he works for the same employer doing snow removal.  The evidence supports a finding that his work is stable and he is able to provide for his family.

52.     Respondent has resided at the same address for the past three years.

53.     Respondent and the Children live in a mobile home trailer with Respondent's girlfriend and his girlfriend's two daughters.  Although the home only has two bedrooms, the Children testified that the bedrooms are large and they have enough room for their things.  They also testified that they have a good relationship with the Respondent's girlfriend and her children.  They did not express concern or complaints about their living arrangements in Sandy, Utah.

54.     The evidence supports that Respondent, his girlfriend, her two daughters, and the Children live as a close, loving and mutually supportive family.  This relationship was confirmed by the Children's school teachers.

55.     The Children testified that the Respondent's girlfriend treats them as if they were her daughters and the Children treat Respondent's girlfriend as if she were their mother.  The Children refer to her as "Mom."

56.     Respondent's girlfriend cooks meals and cares for the Children when Respondent works.

57.     The Children expressed love for Respondent's girlfriend and her two daughters and said they feel loved by them as if they were family.

58.     Based on the court's observation during the interview in chambers, the Children's demeanor and statements support that they feel safe and emotionally secure living in Utah with Respondent.

59.     Since the Children have come to live with Respondent, his employment has enabled him to provide them a home, food, clothing, education, among other basic needs and opportunities.

60.     Following the controversy that arose when the Children learned that their mother is pregnant, the Respondent testified that the Petitioner began demanding that Respondent return the Children to Mexico.  He denies that Petitioner made any demands prior to that controversy.

61.     Respondent testified that the Petitioner agreed that the Children could remain with him in Utah.  The Children testified that after they arrived in Utah, Respondent told them that Petitioner had agreed that they could remain in Utah until they chose to return to Mexico.

62.     Sometime after the controversy arose, Respondent put Petitioner on the speakerphone with Respondent and the Children.  Respondent told Petitioner in that conversation, in the presence of the Children, that it was not up to him or Petitioner, but that it was up to the Children where they lived.

63.     Both Children said that they wanted to remain in Utah with Respondent, to which Petitioner responded that would be fine.

64.     Petitioner has continued to call and talk with the Children, though she has become increasingly upset.

65.     Respondent told Petitioner and the Children that if the Children wanted to go to Mexico, he would pay for their tickets to return.  Respondent repeated his statement in court that he not only would allow, but would pay for the Children to return to Mexico whenever it is their wish to do so.

66.      Respondent does not want to force his Children to return to Mexico against their wishes.

67.     The court has observed the Children and their demeanor in chambers under stressful circumstances.  The children responded clearly and comfortably to the questions by the Guardian Ad Litem, the court and Petitioner's counsel.  The court explained that they would not have to make the decision of whether they return to Mexico, but that was the responsibility of the court.  The court also explained that their views are important to the court and the court wanted to hear their views.  They responded carefully, but in a relaxed and natural way.  They demonstrated a strong command of English, and indeed, expressed some concern about their ability to express themselves in Spanish.  Through the course of the interview, it became clear that they strongly desire to remain in Utah with their father.  They expressed an emotional and strong objection to being required to return to their mother in Mexico.  They expressed their view that they would not feel safe living in the neighborhood where Petitioner's home is located.  They also expressed they would not feel comfortable living in the home with their mother and her boyfriend.  If there were to be a visit, they wanted another adult to accompany them.

Through the interview, the court found the Children to be mature for their ages and capable of formulating their own ideas and feelings about where they want to live.

68.     Based on the court's observations, it finds that the Children have attained an age and degree of maturity at which it is appropriate to take into account their views.

69.     The court further finds that both Children have a strong desire to stay with their father in Utah and to not be forced to return to Mexico.

70.     More than one year has elapsed between the date since Petitioner alleges the Children were wrongfully retained by Respondent in the United States and the date Petitioner commenced these proceedings.

71.     The Children are now settled in their new environment with Respondent in Utah, having become so settled in Utah that forcing them to return to Mexico against their wishes would be against the Children's best interest.

## IV.  CONCLUSIONS OF LAW

The court finds that the Hague Convention applies to this dispute.  Both Mexico and the United States are contracting states.  *See* 42 U.S.C. § 11603(e)(1)(A); Hague Conv., art. 3.

Petitioner alleges that the Respondent wrongfully removed the Children from their home in Mexico on June 29, 2012 and continues to wrongfully retain them in the State of Utah.  She alleges that such conduct is in violation of Article 3 of the Hague Convention and despite her efforts the Children have not been returned to Mexico.  Petitioner further alleges that under Mexican law, she has rights to custody of the Children and Respondent violated those custody rights by refusing to return the Children to Mexico.

Petitioner bears the burden of showing by a preponderance of evidence that the Children's removal or retention in Utah was wrongful.  To do so, the Petitioner must prove:

    (a)   the Children were habitually resident in Mexico at the time of removal or retention;

    (b) the removal or retention was in breach of Petitioner's custody rights under the laws of

         Mexico; and

    (c) Petitioner was exercising those rights at the time of removal.

*Chafin v. Chafin,* 133 S.Ct 1017, 1021 (2013) (quoting Hague Conv. Art 3).

       The first issue is whether Petitioner has demonstrated that the Children were habitual residents of Leon, Mexico before coming to the United States.  The court finds that the Petitioner has established this requirement.  The evidence is undisputed that the Children lived in Leon, Mexico from 2009 until the end of June 2012.  All reasonable inferences from the evidence support a conclusion that they were established with all expectations that Leon would be their residence for the indefinite future.  They were settled in the family home, attending school and going about normal activities.  The Respondent argues that the issue of habitual residence should be determined at the time the Petitioner first began demanding the Children be returned to Mexico, which he contends was not until late summer or fall 2013.  Petitioner argues that by that time the habitual residence was the United States.  The court is convinced that the proper time for the determination is June 2012, when the Children left Mexico and that they were habitual residents of Leon, Mexico at that time.

       The next issue is whether the removal or retention was in breach of Petitioner's custody rights.  The issue of "custody" must be addressed under the law of Mexico.  *See Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997); *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1284 (S.D. Fla. 1999).  Pursuant to Mexico's Civil Code, both parents generally have "rights of custody" to their children at all times.  *See, e.g., Asuncion Mota v. Rivera Castillo*, 692 F.3d 108

(2d Cir. 2012); *Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000); *Saldivar v. Rodela*, 879 F. Supp. 2d 610 (W.D. Tex. 2012).

Petitioner has provided the court with a declaration by Petitioner's Mexican counsel, as well as an Article 15 certification from the Mexican Foreign Ministry (the Mexican designated "Central Authority" under the Hague Convention), both of which provide explanations of *patria potestas*, which means "parental authority" and is somewhat akin to the American notion of "legal custody" or decision-making authority for a minor child.  In Spanish, "custodia" refers to what we in the United States would call "physical custody," which addresses which parent a child lives with.  While a Mexican court may grant custody to one parent, it does not negate the other parent's rights of parental authority.  Petitioner's *patria potestas* rights are rights of custody under the Hague Convention.

 The evidence supports the conclusion that Petitioner had physical custody of the Children, and by Respondent's acquiescence, they had been allowed to remain in her custody for the three prior years.  During that period, she provided for the Children's lodging, food and clothing.  She enrolled them in schooling and exercised normal parental rights.  Although there was no formal decree providing her separate custody rights and she took no steps to limit or cut off Respondent's parental rights, under Mexican law she had the right as a parent to custody of the Children.

The question of whether Respondent removed or retained the Children in breach of Petitioner's custody rights is more difficult.  The evidence is undisputed that the Children came to Utah at the end of June 2012, with the permission and consent of Petitioner.  Their removal to Utah was not wrongful.  Petitioner contends, however, that after the two-week visit, to which she agreed, Respondent wrongfully retained the Children in Utah.  Petitioner contends that she

demanded return of the Children, but Respondent refused, telling her she would never see her Children again.  Respondent on the other hand testified that it was understood when the Children came to Utah that they would remain indefinitely in Utah, that after they were here Petitioner agreed to their remaining and that she changed her mind only later.

The Petitioner bears the burden of proving that the Respondent wrongfully retained the children in Utah.  The evidence is inconclusive on this issue.  The fact that Petitioner filed an application for the return of the Children in August 2012 supports Petitioner's testimony.  She states in her application that she had agreed to only a two-week visit. In addition, the Children testified that their mother told them they were coming for a two-week visit.  The evidence, however, is equally as supportive of Respondent's testimony that there was agreement that the Children would remain in the United States until they wished to return.  This testimony is supported by the fact that the Children brought with them passports, social security cards, school identification cards and, most importantly, immunization records.  Respondent testified that they brought these records to enable him to enroll the Children in school.  This explanation is more credible than Petitioner's assertion that the records were to allow their birth certificates to be corrected.  In addition, the evidence is strong that Petitioner had continual contact and discussions with both of the Children until late summer 2013 when the controversy over her pregnancy arose.

Petitioner's claim that she did not know the Children's location lacks credibility given that she likely had access to the money receipts with the address on them, even if she chose not to get it from the financial institution.  The evidence is also strong that Petitioner had the Respondent's telephone number and they communicated on Facebook.  This information should have made it relatively easy for Petitioner to have learned the address.  The testimony confirms

that until the controversy arose, there were frequent contacts between Petitioner, the Respondent and the Children.  Given the fact that Respondent has lived at the same address, in a trailer house that he owns, and that the evidence does not support a conclusion that he attempted to hide or conceal the Children, Petitioner's story is not persuasive.  Because Petitioner bears the burden of proof on this issue, and the court finds the evidence inconclusive as to whether there was agreement for the Children to remain in Utah, the court finds that Petitioner has failed to prove that the retention of the Children in Utah was wrongful.

But even if Petitioner had been able to prove that the Children were wrongfully retained in Utah, her petition would nevertheless fail because of the exceptions applicable under the Hague Convention.  *Abbott v. Abbott,* 130 S. Ct. 1983, 1990 (2010) (citing 42 U.S.C. § 11603(a)); *Blondin v. Dubois,* 189 F.3d 240, 245 (2nd Cir. 1999); *see also* 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").  Moreover, "[e]ven where the grounds for one of these 'narrow' exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent."  *Blondin*, 189 F.3d at 246 n.4 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067) (6th Cir. 1996) ("[A] federal district court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.").

### *Article 12 "Well-Settled" Defense*

Article 12 of the Hague Convention provides, in relevant part:

> Where a child has been wrongfully removed . . . and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention,

the authority concerned shall order the return of the child forthwith.  The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Art. 12.

The Convention requires that a child shall be returned to the state from which he originally was wrongfully removed unless both of two conditions are met: (1) one year has elapsed between the date of wrongful removal and the date proceedings commence; and (2) the child is found to be "well settled" in her new environment.  *Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 926 (2012).

In determining whether a child is settled within the meaning of Article 12, a court considers a number of factors that bear on whether the child has "significant connections to the new country."  51 Fed. Reg. at 10509.  These factors include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.  The most important factor is the length and stability of the child's residence in the new environment.  *In Re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir 2009).

It is undisputed that ABTO and MZTO have resided in Utah with Respondent for just over one (1) year.  Counsel for Petitioner conceded at closing argument that under Second Circuit precedent, which has been followed in this district, equitable tolling does not apply even where a parent acts to conceal the whereabouts of a child.  *See Loranzo v. Alvarez,*  697 F.3d 41, 51 (2nd Cir. 2012), *cert. granted in part,* 133 S. Ct. 2851 (June 24, 2013); *Matas-Vidal v. Libbey-*

*Aguilera,*  Case No. 2:13-cv-00422 (Dkt. No. 36) (Utah D. Aug. 5, 2013) (Kimball, J.)

Moreover, even were equitable tolling to apply, the evidence in this case does not support that

Respondent acted to conceal the Children.  They have remained at the same address, been

regularly enrolled in school and having lived openly in the community.

      The evidence strongly supports that both ABTO and MZTO are well-settled as that term

is used in the Hague Convention.  Each of the six factors to be considered by the court weigh

heavily in favor of the Respondent, which supports a conclusion that the Children have

significant connections to Utah.  (1) <u>Age</u>:  the Children are ages 11 and 12.  At that age,

involvement in their community is important, as are friends and school.  (2) <u>Stability and

duration</u>:  the evidence supports that Respondent provides a stable home, and has done so for the

entire time the Children have been in Utah.  Moreover, he has been at the same location since

2009 when he moved to Utah.  The Children identify their home and relationships with

Respondent and his partner as close and loving.  Respondent sets boundaries and expresses

concern about the welfare of the Children by setting appropriate curfews and other rules.  (3)

<u>School</u>:  the evidence is particulary strong on this factor.  Both ABTO and MZTO are succeeding

in school, earning mostly A's and B's.  They participate in school programs, including violin and

debate.  Their teachers confirm that they are thriving in the school environment.  It is significant

that they seldom miss school, that their father helps with their school work and that they are

already setting goals to improve and continue their schooling in the United States.  (4) <u>Friends

and relatives</u>:  the Children's testimony, confirmed by their school teachers, is that they have

friends both at school and in the community.  They also have family ties, including an aunt and

cousin next door, with whom they often visit.  (5) <u>Community and extra-curricular activities</u>:  the

Children are planning to take music lessons outside of school.  Their father has indicated an

ability and willingness to pay for these lessons.  Further, their participation in debate and

orchestra, although not technically extra-curricular, indicates the same interest that is to be

considered under this factor.  (6) Respondent's employment and stability:  Respondent has been

employed full-time by the same employer and has been able to provide well for his family,

including purchasing a mobile home.  He works both during the summer and winter months.  He

has in the past provided support for the Children while they were in Mexico.

By contrast, the Children described their experience in Leon, Mexico, in terms that

indicate that they were insecure and often in circumstances that made them fearful and

uncomfortable.  They did not like the living arrangements with Petitioner and her boyfriend.

They did get along well with two of the boyfriend's three children.  Significantly, they felt that

they were often left alone and required to cook their own meals.

Under the facts of this case, ABTO and MZTO are well-settled in their new home in

Utah.  The court finds that it would be disruptive and traumatic to remove them from the family

they now accept and from a school which they enjoy and at which they are thriving.  The well-

settled exception has been satisfied and the court finds under this exception, that even were the

Children wrongfully removed, they should remain in Utah.

### The Article 13 "Age and Maturity" Exception

The Hague Convention provides that "[t]he judicial or administrative authority

[considering a petition] may also refuse to order the return of the child if it finds that the child

objects to being returned and has attained an age and degree of maturity at which it is appropriate

to take account of its views."  Hague Convention, art. 13.

The age and maturity exception is to be narrowly construed and must be shown by a

preponderance of the evidence.  *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000) (citing

§§ 11601(a)(4), 11603(e)(2)(A)).

The Convention contains no age limit for applying the exception. *Blondin II*, 238 F.3d at 167; *Raijmakers-Eghaghe v. Haro*, 131 F. Supp. 2d 953, 957 (E. D. Mich. 2001). The court is to consider the child's maturity level and ability to understand the circumstances and consequences of the decision.

ABTO is twelve years old and MZTO is eleven. Both children were interviewed in chambers with counsel and other court personnel present. Neither the Petitioner nor Respondent was present, either in person or by telephone, although counsel were present. The Children demonstrated by their behavior and responses that they understood the circumstances and understood the gravity of the decision to be made. Although the court made it clear that it was the court's responsibility, not their's to make the decision, they understood that the views they expressed were important and would be considered by the court. The Children were articulate in English. ABTO and MZTO each expressed a desire to remain in Utah. They expressed reservations about returning to Mexico. The court finds no indication that their answers were rehearsed or coached. Moreover, the views they expressed were sincere and strongly felt. During the interview, the Children were sometimes emotional and tearful, especially when the possibility was discussed that they may be ordered to return to Mexico. Both Children seemed comfortable responding to questions posed by the Guardian Ad Litem and seemed to understand that he represented their interests. The court finds that there is no basis in the evidence to conclude that the views expressed by the Children were a product of undue influence, coercion or otherwise than their own wishes and desires.

Finally, the strong preference to remain in Utah expressed by each of them is consistent with their own description of what their lives are like in Utah compared to their lives in Mexico.

ABTO likes school and her participation in debate.  Debate is not the type of activity she would find comfortable if she were insecure or threatened.  Similarly, MZTO was enthusiastic about learning to play the violin.  Both ABTO and MZTO expressed goals for the future that assume they will remain here.  They unequivocally expressed their love for their "step mother" and their family association.  They did not express similar feelings for family or relatives in Mexico.  They found living in a two-bedroom mobile home preferable to living in a four-story house in Mexico.  Although they said in some respects they believe their school classes are easier here than in Mexico[3], overall they strongly preferred school here.

The court has carefully observed both ABTO and MZTO, has listened carefully to what they have said, has paid attention to their body language and interaction with the process and counsel, particularly the degree of trust that seemed evident between them and the Guardian Ad Litem.  The court finds that they have the level of maturity to express meaningful and well-considered opinions about their own future and preference for remaining in the United States.  The court is further influenced by the recommendation and persuasive argument of the Guardian Ad Litem that the Children's interest is best served by remaining in Utah.  He met with the Children, considered their circumstances and had no interest other than their best interest in making that recommendation.

The court finds that the evidence strongly supports that it is in the best interest of each of ABTO and MZTO to remain in Utah and the United States.

---

[3] The Children stated the teachers in Mexico moved too quickly in math.  In Utah, they move slower so it is easier to understand.

## V.  CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the Verified Complaint and

Petition for Return of Minor Children pursuant to the Hague Convention and the International

Child Abduction Remedies Act is DENIED.  The Clerk of the Court is directed to enter

judgment in favor of Respondent and against Petitioner.

DATED this 20th day of November, 2013.


BY THE COURT:


_____
Clark Waddoups
United States District Judge